IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

APRIL B.,

                        Plaintiff,

          v.                              Civil Action No.
                                         8:22-CV-0743 (GLS/DEP)

KILOLO KIJAKAZI, Commissioner of
Social Security,

                        Defendant.

_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF

ANDERSON LAMB & ASSOCIATES    ARTHUR P. ANDERSON, ESQ.
P.O. Box 1624
Burlington, VT 05402-0010

FOR DEFENDANT

SOCIAL SECURITY ADMIN.         GEOFFREY M. PETERS, ESQ.
OFFICE OF GENERAL COUNSEL
6401 Security Boulevard
Baltimore, MD 21235

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff has commenced this proceeding, pursuant to 42 U.S.C. §

405(g), to challenge a determination of the Commissioner of Social
Security ("Commissioner") finding that she was not disabled between
October 30, 2010, and March 31, 2015, the relevant period, and,
accordingly, is ineligible for the disability insurance benefits ("DIB") for
which she has applied.  The matter, which has a tortuous procedural
history dating back to plaintiff's initial application for benefits in 2010, has
been referred to me for the issuance of a report and recommendation,
pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local
Rule 72.3.  For the reasons set forth below, I recommend a finding that the
Commissioner's determination resulted from the application of proper legal
principles and is supported by substantial evidence.

I.      BACKGROUND

        Plaintiff was born in April of 1977, and is currently forty-six years of
age.  She was thirty-three years old on October 30, 2010, the date she
alleges she became disabled, and December 27, 2010, the date upon
which she filed her application for benefits.  Plaintiff measures five feet and
six inches in height, and weighed between approximately two hundred and
twenty-nine and two hundred and sixty-four pounds during the relevant
period.  Throughout the relevant period, plaintiff lived with her husband and

children in Chazy, New York.[1]

In terms of education, plaintiff reports that she did not graduate from high school but did earn her GED. She has worked in the past most relevantly as a customs broker for a package delivery service.

Plaintiff alleges that she suffers from degenerative disc disease in her lumbar spine that causes pain in her lower back and left leg. As is relevant to her application, plaintiff has treated for her impairments with Dr. Bruce Tranmer, Dr. Carlos Pino at the Center for Pain Management, Dr. Stephen Hausrath and his nurse practitioner ("NP") Lynn Schneider, Dr. Michael Borrello at Vermont Interventional Spine Center, and Dr. Paul Roa.

At the first administrative hearing related to her claim for disability benefits, held in April of 2012, plaintiff testified that she experiences back pain with numbness and tingling in her left leg, none of which were resolved by her two previous spinal surgeries, the most recent of which occurred in 2009. Plaintiff reported that, during the relevant period, she could sit for only fifteen-to-twenty minutes before needing to change positions, could walk about five-to-ten minutes at one time before needing to take a break, and had difficulty lifting objects. She testified that she

---

[1]    Plaintiff's first child was three years old at the time of the initial hearing in April of 2012. Her second child was born in 2012.

could care for her then three-year-old child, and that she could cook and shop with help.

At the second administrative hearing, conducted in April of 2017, plaintiff reported experiencing continued back and leg pain, which she treated primarily with over-the-counter pain medication and gabapentin. She stated that she has tried other prescribed pain medication, but found that it caused too many adverse side effects.  Plaintiff testified that physical therapy has made her pain worse and that a TENS unit did not help alleviate her pain.  She was offered medial branch blocks but did not undergo that treatment because she was afraid it would make her pain worse.  Plaintiff testified that she was able, at the relevant times, to do light housework and take care of her children, but that her husband did the shopping, cleaning, and laundry because she was not able to do those chores.  She further reported that she had a very difficult time around when her second child was born because she was experiencing significant muscle spasms in her back.

At the most recent administrative hearing, held in April of 2020, plaintiff reported that she has always experienced back pain, but that it was worse during the relevant period because of muscle spasms, particularly in 2012 during and after her pregnancy.  She testified that she had a difficult

time being in any posture, and had to change positions constantly.  Plaintiff

further stated that she attempted to exercise by walking on a treadmill but

that activity worsened her back pain, and the TENS unit she was given by

her provider did not help her pain, while her medications helped only a

small amount and injections she received provided only short-term relief.

Plaintiff also reported that she experienced headaches related to her back

pain when she would attempt to lift objects.

II.    PROCEDURAL HISTORY

    A.    Proceedings Before the Agency

Plaintiff applied for DIB payments under Title II of the Social Security

Act on December 27, 2010.  Administrative Law Judge ("ALJ") Arthur

Patane held an administrative hearing related to that application on April

20, 2012, and subsequently issued a decision on May 17, 2012, finding that

plaintiff was not disabled.  After the Social Security Appeals Council

("Appeals Council") denied plaintiff's request for review of that decision on

September 26, 2013, plaintiff brought an action in this court to challenge

the Commissioner's determination.  On October 14, 2015, Chief United

States District Judge Glenn T. Suddaby adopted a report and

recommendation from United States Magistrate Judge William B. Mitchell

Carter and ordered that the matter be remanded to the agency for further

proceedings, including to obtain a medical source statement from an acceptable medical source regarding plaintiff's functional limitations.

ALJ Patane held a second administrative hearing on April 11, 2017, to take additional testimony on remand. On June 21, 2017, ALJ Patane again issued an unfavorable decision, finding that plaintiff was not disabled during the relevant period. The Appeals Council denied review of that new decision, and plaintiff again turned to this court for relief. On September 27, 2019, United States Magistrate Judge Daniel J. Stewart ordered that plaintiff's claim again be remanded for further consideration, finding that the ALJ's finding regarding her ability to perform her past relevant work as a customs broker at step four of the sequential evaluation was not supported by substantial evidence. The Appeals Council subsequently remanded the matter based upon the court's order, and directed that it be assigned to a new ALJ.

Plaintiff's claim was reassigned to ALJ Paul F. Kelly, who held another administrative hearing on April 8, 2020. Following that hearing, ALJ Kelly issued a decision on July 16, 2020, finding that plaintiff was not disabled during the relevant period. That opinion became a final determination of the agency on May 13, 2022, when the Appeals Council denied plaintiff's request for review of ALJ Kelly's decision.

6

B.    The ALJ's Decision

In his decision, ALJ Kelly applied the familiar, five-step sequential test for determining disability.  At step one, he found that plaintiff had not engaged in substantial gainful activity during the relevant period, which spans from October 30, 2010, the alleged onset date of disability, to March 31, 2015, the date plaintiff was last insured for benefits under Title II ("DLI").  The ALJ next found at step two that, during that period, plaintiff suffered from severe impairments that impose more than minimal limitations on her ability to perform basic work functions, including degenerative disc disease of the lumbar spine and obesity.

At step three, ALJ Kelly examined the governing regulations of the Commissioner setting forth presumptively disabling conditions (the "Listings"), *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, and concluded that plaintiff's conditions did not meet or medically equal any of the listed conditions set forth in those regulations, specifically considering Listing 1.04.

ALJ Kelly next surveyed the available record evidence and concluded that, during the relevant period, plaintiff retained the residual functional capacity ("RFC") to perform a range of work at the light exertional level, as defined by the controlling regulations, with the following exceptions:

7

she could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but never climb ladders, ropes, or scaffolds; she could occasionally perform bilateral foot control operations; she required the ability to [alternate] position every 30 minutes, for one-to-two minutes at a time, while staying on task; [and] due to pain, she was limited to simple, routine tasks.

ALJ Kelly went on to step four and concluded that plaintiff was unable during the relevant period to perform her past relevant work as a customs broker. The ALJ then proceeded to step five and, after eliciting testimony from a vocational expert, found that, during the relevant period, plaintiff remained able to perform available work in the national economy, citing as representative positions the jobs of ticket seller, office helper, and photocopy machine operator. Based upon these findings, ALJ Kelly determined that plaintiff was not disabled at the relevant times.

C.    This Action

Plaintiff commenced this action on July 12, 2022.[2] In support of her challenge to the ALJ's determination, plaintiff argues that (1) the ALJ erred in failing both to appropriately assess the opinion from medical expert Dr.

---

[2] This action is timely, and the Commissioner does not argue otherwise. It has been treated in accordance with the procedures set forth in the recently enacted Supplemental Social Security Rules and General Order No. 18. Under those provisions, the court treats the action procedurally as if cross-motions for judgment on the pleadings have been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Bernard Gussoff and to find, based on that opinion and the other available

evidence, that plaintiff's condition medically equaled the presumptively

disabling condition described in Listing 1.04; and (2) the ALJ erred when

assessing the RFC finding by improperly rejecting her subjective reports

and the various functional opinion evidence that show plaintiff was much

more limited during the relevant period than accounted for by the ALJ in his

RFC finding.  Dkt. No. 12.

Oral argument was conducted in this matter, by telephone, on May

31, 2023, at which time decision was reserved.

III.    DISCUSSION

A.    Scope of Review

A court's review under 42 U.S.C. § 405(g) and 1383(c)(3) of a final

decision by the Commissioner is subject to a "very deferential" standard of

review, and is limited to analyzing whether the correct legal standards were

applied, and whether the decision is supported by substantial evidence.

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012);

*Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221

F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.

1998).  Where there is reasonable doubt as to whether an ALJ has applied

the proper legal standards, the decision should not be affirmed even

9

though the ultimate conclusion reached is arguably supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). If, however, the correct legal standards have been applied, and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision will withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 390, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord, Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003). To be substantial, there must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401 (internal quotation marks omitted); *Williams*, 859 F.3d at 258. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis on the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258

(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951);

*Mongeur v. Hechler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).

    B.    <u>Disability Determination: The Five-Step Evaluation Process</u>

    The Social Security Act ("Act") defines "disability" to include the

"inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months[.]"  42 U.S.C. §

423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [be] of
> such severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

    The agency has prescribed a five-step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

the claimant is engaged in substantial gainful activity ("SGA"); if so, then

the claimant is not disabled, and the inquiry need proceed no further.  *Id.*

§§ 404.1520(b), 416.920(b).  If the claimant has not worked at a level constituting SGA, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments that significantly restricts his or her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled."  *Martone v. Apfel*, 70 F. Supp. 2d 145, 149 (N.D.N.Y. 1999) (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If it is determined that it does, then as a final matter, at step five the agency must examine whether the claimant can do any other work.  *Id.* §§ 404.1520(g), 416.920(g).

The burden of showing that the claimant cannot perform past work lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been satisfied, however, it

becomes incumbent on the agency to prove that the claimant is capable of performing other available work. *Perez*, 77 F.3d at 46. In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills. *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

    C.    <u>Analysis</u>

        1.    <u>Issue Preclusion</u>

Before reaching the merits of plaintiff's assertions of error in the ALJ's findings, I acknowledge that the Commissioner has at least nominally asserted that issue preclusion might apply in this instance. In the opening paragraphs of her brief, the Commissioner asserts that the arguments made by plaintiff in this current action are "largely identical to those that [Magistrate Judge Stewart] previously rejected" and "[p]laintiff has shown no reason for this Court to deviate from its previous findings." Dkt. No. 16, at 3. In a later footnote, she asserted more strongly that the argument regarding Dr. Gussoff's opinion, to the effect that plaintiff's condition medically equaled Listing 1.04, should be precluded based on the prior court decision, arguing that "[p]laintiff's objections are essentially identical to those raised before, and the ALJ's reasons for rejecting Dr. Gussoff's

opinion are nearly identical to those outlined in the 2017 decision, which this Court has already upheld."  Dkt. No. 16, at 9 n.3.

"Issue preclusion, also referred to as collateral estoppel, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to [a] prior judgment.'" *Cayuga Nation v. Tanner*, 6 F.4th 361, 374 (2d Cir. 2021) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)).  "A party may invoke issue preclusion only if: '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party [raising the issue] had a full and fair opportunity to litigate the issue [in the prior proceeding]; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Cayuga Nation*, 6 F.4th at 374 (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002)).  "'The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion,'" but "'the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with . . . the party opposing the application of issue preclusion.'"  *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) (quoting *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996)).

It is not altogether clear that issue preclusion should apply in this setting, and there do not appear to be any cases squarely analyzing the doctrine's applicability in the context of a Social Security review proceeding.  Magistrate Judge Stewart's decision addressed the administrative decision from ALJ Patane, applying the familiar deferential standard applicable to such an administrative review.  The focus of this proceeding is upon a decision from a different adjudicator, ALJ Kelly, who reviewed the matter *de novo*, untethered to the previous agency rulings, although, to be sure, ALJ Kelly's decision is striking similar and in many relevant respects identical to ALJ Patane's decision.  I will assume, solely for argument's sake, that issue preclusion would potentially be available as a defense in this proceeding.

The first three factors of the relevant test seem to be met in this case. Plaintiff previously raised the arguments now relevant here, Magistrate Judge Stewart rendered specific findings regarding those issues in his 2019 decision, and there has been no claim by plaintiff that she lacked a full and fair opportunity to litigate those issues in the previous proceeding before this court.[3]  The only factor that has not been clearly met is the last

---

[3]     Plaintiff does argue that issue preclusion should not apply in this instance because ALJ Kelly rendered a new finding on the merits without raising or applying issue preclusion related to ALJ Patane's 2017 decision.  Dkt. No. 21, at 9-10.  However,

one – that is, whether Magistrate Judge Stewart's resolution of the relevant issues in the previous decision was essential or necessary to support the judgment on the merits.  "It is well established that although an issue was fully litigated and a finding on the issue was made in the prior litigation, the prior judgment will not foreclose reconsideration of the same issue if that issue was not necessary to the rendering of the prior judgment." *Halpern v. Schwartz*, 426 F.2d 102, 105 (2d Cir. 1970).  "The 'necessarily decided' requirement is commonly based on the grounds that (a) 'the tribunal that decided the first case may not have taken sufficient care in determining an issue that did not affect the result, even though the parties vigorously litigated that issue'; and (b) 'appellate review may not be available to ensure the quality of the initial decision.'" *Roseman v. Bloomberg L.P.*,14-CV-2657, 2016 WL 3866375, at *3 (S.D.N.Y. June 17, 2016) (quoting 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4421 (2d ed. 2002).  "If the decision was implicitly necessary, 'it will be the basis for collateral estoppel.'"  *Postelwaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003) (quoting *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d Cir.

---

the issue is not whether ALJ Patane's 2017 findings, or indeed any of the agency's findings, are entitled to issue preclusion, but rather whether issue preclusion should be applied as to Magistrate Judge Stewart's findings in the previous proceeding before this court.  As was already discussed, although ALJ Kelly issued a *de novo* decision, he adopted much of the relevant analysis verbatim from ALJ Patane's previous decision.

1986)).  Again, I note that the burden to establish that an issue was

necessarily decided in the prior action rests with the party seeking to apply

the preclusion.  *See Proctor*, 715 F.3d at 414; *accord Gonzalez v. City of*

*New York*, 442 F. Supp. 3d 665, 693 (S.D.N.Y. 2020).

Although somewhat acknowledging the applicable standard for

assessing whether issue preclusion should apply, citing to the Second

Circuit's statement that "[i]ssue preclusion bars successive litigation of an

issue of fact or law actually litigated and resolved in a valid court

determination essential to the prior judgment," the Commissioner does not

explain how she believes the situation now presented meets all the

elements of the controlling test.  Specifically, the Commissioner does not

elaborate on why she contends, if that is indeed her position, that the

findings related to Listing 1.04 and the RFC in the prior court decision were

"essential to the prior judgment."  Instead, the Commissioner spends most

of the argument portion of her brief addressing the merits of plaintiff's

arguments regarding Listing 1.04 and the RFC.  Dkt. No. 16, at 6-26.

Given the Commissioner's failure to address this portion of the relevant

legal standard, and because it is not entirely clear to me that the relevant

findings in Magistrate Judge Stewart's decision were wholly necessary to

rendering a valid judgment,[4] I would decline to apply issue preclusion in this instance and recommend that the issues raised be considered anew on their merits.

    2.   <u>The ALJ's Assessment of Listing 1.04</u>

Plaintiff's first argument involves an assertion that the ALJ erred in failing to find that she medically equaled Listing 1.04 during the relevant period, in part because he improperly rejected an opinion to that effect from the medical expert, Dr. Bernard Gussoff.  Dkt. No. 12, at 15-27.

"In order to demonstrate medical equivalence, a plaintiff 'must present medical findings equal in severity to all the criteria for the one most similar listed impairment."  *Jesse S. v. Comm'r of Soc. Sec.*, 19-CV-1074, 2020 WL 3470492, at *4 (N.D.N.Y. June 25, 2020) (Baxter, M.J.) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)).   Under the applicable regulations, a determination concerning the issue of medical equivalence must be made based on a preponderance of the evidence in the record, and the record must contain one or more of (1) a prior administrative

---

4      Specifically, there was an alternative basis for remanding the matter to the agency in that appeal – namely, the error in the step four determination, and thus reaching those other issues was not strictly necessary, given that the agency would have had to render a new decision for all of the issues upon remand.  Indeed, like many courts, I routinely decline to consider additional assertions of error when a point of error in some portion of an ALJ's decision is identified as requiring remand.

medical finding supporting medical equivalence, (2) medical expert ("ME") evidence obtained at the hearing level supporting a medical equivalence finding, or (3) a report from the Appeals Council's medical support staff supporting a medical equivalence finding. Social Security Ruling ("SSR") 17-2p. "When an adjudicator at the hearings level obtains ME testimony or written responses to interrogatories about whether an individual's impairment(s) medically equals a listing, the adjudicator cannot rely on an ME's conclusory statement that an individual's impairment(s) medically equals a listed impairment(s)." SSR 17-2p. Indeed, "[w]hether an impairment(s) medically equals the requirements of a listed impairment is an issue reserved to the Commissioner," and the ALJ is charged with the ultimate responsibility for making the finding of medical equivalence. *Id.* "If the ME states that the individual's impairment(s) medically equals a listed impairment, the adjudicator must ask the ME to identify medical evidence in the record that supports the ME's statements." *Id.* Importantly, although the ALJ is required to consider all evidence when making a medical equivalence determination, "the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.* Rather, "a statement that the individual's impairment(s) does not medically equal a

19

listed impairment constitutes sufficient articulation for this finding," given that the statement of reasons as to why the claimant is not disabled at the later steps is sufficient to allow a reviewing court to determine the basis for the finding as to medical equivalence.  *Id.*

On a form dated April 28, 2017, Dr. Gussoff opined that plaintiff's lumbar spine condition medically equals Listing 1.04.  Administrative Transcript ("AT") at 1017.[5]  In making this finding, he cited specifically to exhibits 2F, 13F, 21F, and 28F of the administrative record, noting that plaintiff has an L4-L5 protrusion, compression of a nerve root with discectomy and prior laminectomies, a left foot drop, and refractory pain syndrome.  *Id.*

In his decision, ALJ Kelly found that Dr. Gussoff's conclusion that plaintiff medically equals Listing 1.04 is not supported by either the medical evidence specifically cited by him, or the record as a whole.  AT 1047.  In doing so, the ALJ discussed how each of the exhibits cited by Dr. Gussoff do not show symptoms that are equivalent in severity to the symptoms contemplated by that listing, including explaining that the 2004 MRI study is not a valid basis for showing an equivalent finding to nerve root

---

[5]    The administrative transcript is found at Dkt. No. 7, and will be referred to throughout this decision as "AT __."

compression because the study was completed well before plaintiff's two spinal surgeries, and more recent imaging shows that plaintiff's condition has changed in the intervening time.  AT 1046-47.

As to the ALJ's conclusion that the cited evidence does not support Dr. Gussoff's medical equivalence finding, I see nothing unreasonable in that assessment.  Exhibit 2F is indeed most relevantly a copy of an MRI report from 2004, from prior to when plaintiff underwent two spinal surgeries.  AT 247-48.  Exhibit 13F contains the report of Dr. Wassaf's 2011 consultative examination, in which it was reported that plaintiff demonstrated full range of motion in her lumbar spine, diffuse tenderness in the lumbar area, and tenderness in her bilateral sacroiliac joints, with no deficits in strength in her lower extremities.  AT 407.  Exhibit 21F is comprised of two records from Dr. Roa related to treatment provided in early 2013, in which Dr. Roa observed no lumbar tenderness, positive straight leg raise or loss of strength or sensation, but rather only decreased and painful range of motion in the lumbar spine.  AT 763-64.  Dr. Roa instructed plaintiff to take naproxen and Robaxin, a muscle relaxant, and noted that she reported experiencing only mild and intermittent numbness or tingling in her left leg.  AT 764.  At the follow-up appointment a month later, Dr. Roa noted that plaintiff reported Robaxin was working "very well"

for her pain, although she continued to have right-sided pain that was worse with extension.  AT 761.  Dr. Roa recommended that plaintiff undergo a right-side medial branch block, but plaintiff stated that she would have to think about that.  *Id.*  Lastly, exhibit 28F contains notes from pain management physician Dr. Pino, including a treatment record dated May 25, 2010, in which Dr. Pino observed that plaintiff exhibited tenderness to palpation of her left lumbosacral spine and slightly decreased strength in her left leg, although her sensation in that limb was intact.  AT 886.  A subsequent record from September 16, 2010, shows that plaintiff reported that recent sacroiliac joint injections had not improved her pain, but that use of methocarbomol – Robaxin – for muscle spasms had greatly decreased the myofascial component of her pain.  AT 874.  Dr. Pino observed on this occasion that plaintiff had minimal tenderness to palpation of her lower back, no tenderness over the sacroiliac joints, and good power and tone in her lower extremities, although her sensation in her left leg seemed to be "slightly diminished" and she had a positive left straight leg raise.  AT 874. This exhibit also documents that plaintiff underwent an epidural steroid injection and a sacroiliac joint injection in June and August of 2010, respectively.  AT 878, 882.

Having reviewed the cited records, I find that the ALJ's conclusion that they do not support Dr. Gussoff's medical equivalence opinion is a reasonable one. Although the cited records certainly document some symptoms, they do not disclose the type of symptoms that would suggest an equivalent level of severity as is required by Listing 1.04. In the absence of greater explanation from Dr. Gussoff regarding how such findings would be equivalent to Listing 1.04, I am unable to say that the ALJ erred in finding that Dr. Gussoff's opinion was not supported by such evidence.

Further, in terms of the other evidence, the ALJ discussed plaintiff's treatment and the objective and other findings contained within the various treatment records when assessing plaintiff's RFC. The ALJ specifically highlighted that, although a few examinations revealed greater symptoms, such as weakness in her left leg or positive straight leg raising, such findings were not typical, and most examinations revealed fairly moderate decreases in range of motion or tenderness in her lower back. AT 1050-53. In light of the ALJ's explanations regarding the objective medical findings, the relatively low level of treatment provided to the plaintiff during the relevant period, notations of significant positive response to certain treatments such as Robaxin, and the fact that plaintiff did not seek

treatment for her spine impairment for approximately two years during the relevant time period, I find that the ALJ's conclusion that plaintiff did not medically equal Listing 1.04 during the relevant time is supported by substantial evidence.

As SSR 17-2p makes clear, although an ALJ is required to seek an opinion from a medical source when medical equivalence might be at issue, he or she is not required to blindly adopt such expert's opinion; indeed, the equivalence issue is one reserved to the Commissioner. Because the ALJ's assessment of the evidence cited by Dr. Gussoff is a patently reasonable interpretation of that evidence, plaintiff's lengthy argument regarding how the evidence supports that her impairment medically equals Listing 1.04 is little more than a request for this court to reweigh the evidence in a different manner, something which is not within the court's scope of review under the substantial evidence standard. *Warren v. Comm'r of Soc. Sec.*, 15-CV-1185, 2016 WL 7223338, at *9 (N.D.N.Y. Nov. 18, 2016) ("When applying the substantial evidence test to a finding that the plaintiff was not disabled, the Court 'will not reweigh the evidence presented at the administrative hearing . . . nor will it determine whether [the applicant] actually was disabled.'"); *accord Shyla D. v.*

*Kijakazi*, 20-CV-1295, 2022 WL 798158, at *3 (N.D.N.Y. Mar. 16, 2022) (Stewart, M.J.).

For all of the above reasons, like Magistrate Judge Stewart, I recommend that the court decline plaintiff's invitation to reweigh the evidence, and that plaintiff's arguments regarding this issue be rejected and the ALJ's step three finding be upheld as consistent with the applicable legal standards and supported by substantial evidence.

### 3.    The ALJ's Assessment of Plaintiff's RFC

Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence in large part claiming that the ALJ failed to engage in a proper assessment of her subjective reports and the medical opinion evidence.  Dkt. No. 12, at 27-34.  Specifically, she contends that the ALJ improperly weighed the opinions of medical expert Dr. Gussoff and NP Schneider, asserting that the ALJ failed to provide sufficient reasons for discounting these sources' opinions to the extent they suggest greater limitations than accounted for in the RFC finding, and for instead relying on the stale opinion of Dr. Tranmar.  *Id.*  Encompassed within this argument is plaintiff's assertion that the ALJ improperly assessed her subjective reports

and then relied on that improper assessment when weighing the above opinion evidence.

### a. Plaintiff's Subjective Reports

As part of her RFC argument, plaintiff asserts that the ALJ erred in a number of respects when assessing whether her subjective reports are consistent with and supported by the other evidence in the record, as well as that the assessment of such issues both unduly informed and poisoned the ALJ's assessment of the opinion evidence.  Dkt. No. 12, at 30-34.

Plaintiff first argues that the ALJ's reliance on her "conservative" treatment as a basis for both finding her subjective reports to be inconsistent with the evidence and for rejection greater limitations opined by certain sources is erroneous because not only was her treatment more extensive than appreciated by the ALJ, but the fact that a claimant receives only modest treatment is not a sufficient reason to reject a medical source's opinion.  Dkt. No. 12, at 33-34.

The ALJ acknowledged that, prior to her onset date, plaintiff underwent two lumbar spine surgeries, in 2005 and 2009, but found that she received only conservative treatment during the period at issue, consisting of over-the-counter pain medication, gabapentin, a muscle

relaxant, and a TENS unit.  AT 1049-53.  Although plaintiff is correct that she received multiple injections within the period documented by the record, I note that those were performed prior to the alleged onset date – in June and August of 2010 – and therefore do not detract from the ALJ's statement that plaintiff's treatment during the relevant period has been conservative.  AT 878, 882.  Dr. Roa did recommend that she undergo a right-side medial branch block injection in February of 2013, but, as the ALJ noted, there is no evidence that plaintiff ever agreed to undergo that treatment.  AT 761-62, 1049.  Plaintiff explained that she did not pursue that option because she was afraid that it would make her pain worse after her experience with receiving cortisone injections.  AT 500.  Affording appropriate deference to the ALJ's assessment of the claimant's subjective reports, I cannot say that it was unreasonable for the ALJ to disregard this recommendation when considering the nature of plaintiff's treatment given the undisputed fact that she chose not to proceed with that treatment. Further, the fact that radiofrequency ablation and spinal fusion surgery were posited by one provider as potential future modalities of treatment says little about the nature or severity of plaintiff's symptoms, as those options were not actively pursued by either plaintiff or her physicians during the relevant time period.

Based on the available evidence, which shows that plaintiff primarily resorted to over-the-counter pain medication, a TENS unit, and a muscle relaxant medication and gabapentin to manage her pain during the relevant period, I do not find the ALJ's characterization of the treatment here as "conservative" to be unreasonable. Further, to the extent that "conservative" treatment has a specific meaning limited to very benign treatment, it is clear that the ALJ, although utilizing that word, considered the specific treatment modalities plaintiff received over the relevant span of time, along with other factors such as the frequency of treatment, when determining that such factor was indicative that her impairments were not symptomatic or limiting to the extent alleged by the plaintiff. The ALJ also did not "impose [his] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered," but, rather than looking at the intrusiveness of the treatment, focused on the fact that so little treatment occurred despite plaintiff's allegations of significant pain and restriction. *Cf. Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Nor was the "conservative" nature of treatment the only basis for the ALJ's finding that plaintiff's subjective reports of symptoms were not wholly consistent with the evidence in the record, but also the lack of consistent significant objective findings. In light of the holistic assessment

of the various considerations, I do not find the ALJ's assessment of or reliance on the nature of plaintiff's course of treatment to be erroneous.

Plaintiff next argues that the ALJ erred in characterizing her pain as intermittent despite evidence reflecting it was in fact constant and consistent. While plaintiff undeniably is correct that the record as a whole documents that she has been experiencing back pain as a result of her impairments for an extended period of time, it also shows that it was not always present at the same level. Indeed, although plaintiff continued to report back pain with radiation into her left leg in particular from the alleged onset date through September of 2011, she reported an exacerbation of her typical pain beginning approximately December of 2012, when she presented to Dr. Hausrath with claims of muscle spasms. AT 751. The following month, she reported to Dr. Roa that this muscle pain had started around Thanksgiving, resolved for a time, but later returned around Christmas. AT 763. Plaintiff specifically tied this pain exacerbation to gaining weight while recently pregnant and subsequently "doing a lot of exercise" in an attempt to lose the weight. AT 763. This is consistent with plaintiff's testimony at the 2017 and 2020 administrative hearings to the effect that she experienced significant muscle spasms during and after her pregnancy in 2012. AT 502, 1074. I do not construe the ALJ's decision as

suggesting that plaintiff experienced times when she was pain-free, and any references by the ALJ to intermittent pain or the fact that her pain "started" around Thanksgiving in 2012 are more appropriately assessed as referring to exacerbations of her typical pain level.

As to plaintiff's objections to the ALJ's reliance on her purported statements to Dr. Roa that she engaged in significant exercise in 2012 and early 2013, I find that reliance not to be in error. Dr. Roa's treatment record from January of 2013 specifically reflects reports by the plaintiff to the effect that "she has some extra weight that she has been working on losing at this time by doing a lot of exercise," which she felt might be contributing to her muscle spasms. AT 763. There was no reason that the ALJ was required to accept plaintiff's statements at the 2017 administrative hearing that she did not remember doing a lot of exercise or telling Dr. Roa that she had, particularly as plaintiff clarified at the 2020 administrative hearing that she had in fact been doing more walking at that time in an effort to lose weight, albeit walking slowly on a flat-level treadmill, even corroborating the statement in Dr. Roa's record by testifying that she "was doing too much walking" and it was bothering her. AT 509-10, 1078-79. Thus, contrary to plaintiff's argument that Dr. Roa's treatment record did not accurately reflect her exercise activity, her later hearing testimony confirms that report.

It was therefore not error for the ALJ to rely on that report of activity as one factor in assessing plaintiff's subjective reports and RFC.

As to the ALJ's reliance on his characterization of plaintiff's "good response to treatment with a TENS unit and a muscle relaxant," I acknowledge that the ALJ's assumption that the TENS unit provided relief for plaintiff is not supported by the record.  AT 10.  Although plaintiff did indeed report to Dr. Roa in January of 2013 that a TENS unit had helped "in the past," the follow-up note from Dr. Roa indicates only that she was using that unit, but did not provide any information about its efficacy at that specific time.  AT 761, 763-64.  However, I do not believe that this mistake is material, as the ALJ relied on the efficacy of not only the TENS unit, but also her prescribed muscle relaxant.  As was discussed previously, plaintiff reported both in September of 2010 and February of 2013 that methocarbomol/Robaxin was working very well to address her pain, or at least a component of it.  AT 761, 874.  It is not clear how long plaintiff took methocarbamol in 2010, but it was re-prescribed to her by Dr. Roa in January 2013, and he instructed her to continue using that medication in February of 2013 based on its reported efficacy.  AT 761.  I note that Dr. Roa's treatment record from that date does not document any reported side effects from that medication.  *Id.*  At one of the administrative hearings,

plaintiff reported having to stop taking a pain medication prescribed by NP Schneider due to side effects, and reported that medication as being diazepam.  AT 490.  A treatment record signed by Carla Hausrath[6] from December of 2012 – at the same clinic where plaintiff was routinely treated by NP Schneider – does indeed indicate that plaintiff was prescribed diazepam at that time.  AT 752.  The record therefore corroborates that plaintiff experienced significant benefit from Robaxin prescribed in early 2013, and there is no evidence to suggest that Robaxin caused the same side effects that led plaintiff to cease taking diazepam, as reported at the hearing.

Further, as the ALJ noted, the treatment record reflecting instructions for plaintiff to continue Robaxin because of its reported efficacy in addressing her pain is the last instance of treatment for her back pain in the record until the DLI, with the exception of Dr. Wassaf's January 2014 consultative examination.  I note that plaintiff reported to Dr. Wassaf at that time that her current medications included a muscle relaxant, although she did not specify its name, dose, or frequency.  AT 784.  These two records therefore provide support for the ALJ's reliance on documented improvement with use of a prescribed muscle relaxant, even if not the

---

[6]     It is not clear what credentials this source holds.

TENS unit, and there is no evidence that plaintiff suffered negative side effects from Robaxin.  The reported efficacy of Robaxin in the February 2013 treatment record also supports the ALJ's supposition that the lack of documented treatment for the rest of 2013 through the DLI suggests that plaintiff's symptoms were not as severe or limiting as alleged, as Dr. Wassaf's report appears to confirm she continued to take that medication during the time there is no documented treatment visits.  The ALJ further noted that plaintiff reported at the hearing that she had consistent medical insurance throughout the relevant hearing, highlighting that there was no apparent financial barrier to treatment to explain the gap in care.  Under the circumstances, I cannot say that it was unreasonable for the ALJ to assess the evidence in question as being inconsistent with plaintiff's reports of the persistence, intensity, and limiting effects of her symptoms.

For all of the above reasons, I recommend that the ALJ's assessment of plaintiff's subjective reports be found to be supported by substantial evidence.

### b.  Opinion Evidence

As was discussed above, plaintiff argues that the ALJ erred in assessing the available opinion evidence when formulating his RFC finding.

In particular, plaintiff argues that the ALJ erred in failing to afford more weight to the opinion of Dr. Gussoff which, she asserts, is supported by considerable medical evidence, including the opinions from treating source NP Schneider.  Dkt. No. 12, at 27-30, 34.

Because plaintiff's application was filed prior to March 17, 2017, the prior regulations, which have since been amended, apply to her claim. Under those regulations, the ALJ was required to consider whether the treating physician's opinion was entitled to controlling weight, which must be afforded "so long as it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with (or contradicted by) other substantial evidence in the claimant's case record. *Schillo v. Kijakazi*, 31 F.4th 64, 75 (2d Cir. 2022).  If it is not entitled to controlling weight, or if it is the opinion of a non-treating physician or other acceptable medical source, the ALJ must then determine what degree of weight the opinion is entitled to by considering factors such as (1) the frequency, length, nature, and extent of treatment, (2) the amount of medical evidence supporting the opinion, (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist.  *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019).  In making these findings, the ALJ is required to provide "good reasons" for the

weight afforded to the treating physicians' opinions, which the Second Circuit has defined as "reasons supported by substantial evidence in the record. *Schillo*, 31 F.4th at 75 (citing *Estrella*, 925 F.3d at 96). Moreover, when considering the weight to which the treating physician's opinion is entitled at the second step of this analysis, the ALJ is required to explicitly apply the above factors in his or her analysis; failure to do so is procedural error. *Schillo*, 31 F.4th at 75. However, such error may be held harmless "if the ALJ has otherwise provided 'good reasons' for its weight assignment" or the court is assured that "'the substance of the treating physician rule was not traversed.'" *Schillo*, 31 F.4th at 75 (quoting *Estrella*, 925 F.3d at 96).

### i.  Dr. Gussoff

As was noted above, on April 28, 2017, Dr. Bernard Gussoff provided a medical source statement that is significantly more limiting than the RFC determination. AT 1010-1015. The ALJ afforded little weight to that functional opinion, reasoning that (1) it seems to be largely based on medical evidence not relevant to the period at issue, (2) the evidence cited by Dr. Gussoff does not support the level of restriction he opines, (3) there is no apparent rationale to support some of his findings, particularly related to exposure to environmental irritants, and (4) the opined postural

35

restrictions are not persuasive "given the claimant's conservative treatment history, her good response to treatment with a TENS unit and a muscle relaxant, and a period of more than two years with no complaints regarding her back pain from February 2013 to March 2015."  AT 1054.

The validity and supportability of the reasons provided by the ALJ for affording little weight to Dr. Gussoff's opinion have already been addressed above, related to the assessment of medical equivalence and plaintiff's subjective reports of symptoms.  Notably, Dr. Gussoff does not provide any citation to additional evidence or explanation to support his functional opinion other than what was relevant to his medical equivalence opinion. AT 1010-15.  As was discussed above, that evidence generally does not show more than some moderate objective findings related to decreased range of motion, tenderness or pain with motion, and sporadic notations of somewhat decreased left leg strength or positive straight leg raising tests. Further, the ALJ's discussion of the other evidence to which Dr. Gussoff did not specifically cite provides an explanation for the ALJ's overall finding that this opinion is not consistent with the evidence in the record, as the ALJ acknowledges that, although there are some sporadic findings of greater symptoms, they do not necessarily reflect plaintiff's ongoing or typical condition.  AT 1049-53.  To the extent that plaintiff argues that the medical

evidence shows greater limitations, that assertion is little more than a request to reweigh the evidence in a manner more favorable to her position, something which, again, is not within the court's scope of review. *See Warren*, 2016 WL 7223338, at *9; *Shyla D.*, 2022 WL 798158, at *3. Further, I have already recommended a finding that the ALJ's findings with regard to the conservative nature of plaintiff's treatment, her response to treatment, and the gap in treatment are generally supported and valid bases for rejecting the extent of the limitations reported by plaintiff.  For all of the same reasons, I find that the ALJ's weighing of Dr. Gussoff's opinion is supported by substantial evidence.

I note, moreover, that plaintiff's claim that there is no medical opinion that contradicts Dr. Gussoff's opinion, and that the ALJ's rejection of that opinion is based on the ALJ's reliance upon "his own interpretation of medical evidence," is not accurate.  Specifically, Dr. Wassaf provided an opinion in 2014 concluding that plaintiff has various moderate-to-marked limitations, which the ALJ accepted to the extent of the expression of moderate restrictions.  *See Trepanier v. Comm'r of Soc. Sec.*, 752 F. App'x 75, 78-79 (2d Cir. 2018) (finding that the ALJ did not improperly rely on his own lay judgment where he relied on the opinion of the consultative examiner and other substantial evidence in the treatment notes).  Although

an ALJ should generally not rely heavily on the opinion of a source who examined the plaintiff only once – or, in Dr. Wassaf's case, twice over the course of three years – neither is the ALJ precluded from relying on such an opinion to the extent it is consistent with other evidence in the record. *See Byrne v. Berryhill*, 752 F. App'x 96, 98 (2d Cir. 2019) (noting that, although ALJs generally "should not rely heavily on the findings of consultative physicians after a single examination," such opinions may nevertheless constitute substantial evidence).  Because the ALJ has provided valid reasons for declining to afford significant weight to the opinions from Dr. Gussoff and NP Schneider,[7] and because my review of the evidence assures me that his assessment of the plaintiff's RFC in accordance with the moderate restrictions opined by Dr. Wassaf is supported by substantial evidence, I find that the ALJ has not relied on an

---

[7]     I note that plaintiff has not raised any direct challenge to the weight afforded to the opinions from NP Schneider.  As a nurse practitioner, NP Schneider was not considered an acceptable medical source under the former regulations, and therefore the articulation requirements regarding the relevant factors in 20 C.F.R. § 404.1527 do not apply to her opinion.  Rather, for such sources, the ALJ need only "explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."  20 C.F.R. § 404.1527(f)(2).  The ALJ provided an extensive discussion of why he found NP Schneider's opinion to be worth little weight, and I see nothing in the evidence to suggest that assessment is erroneous or unreasonable.

improper lay interpretation of the evidence or substituted his lay assessment of that evidence for that of a medical source.

## ii.  Dr. Wassaf

Dr. Nader Wassaf was retained by the agency to conduct an examination of plaintiff on two occasions, rendering reports based upon his findings on April 20, 2011, and January 22, 2014.  AT 405-08, 783-87.  In the later report, Dr. Wassaf opined that plaintiff has moderate to marked limitations with respect to her abilities for standing, walking, climbing stairs, bending, squatting, lifting, and operating foot controls, as well as that she should be accommodated in a quiet environment.  AT 786.  The ALJ afforded significant weight to that opinion, finding it to be generally supported by the record, but nevertheless declined to afford great weight to the portion of the opinion that suggested marked limitations.  AT 1054.  The ALJ based this rejection on the conservative nature of her course of care including the fact that she primarily used over-the-counter pain medication for much of the relevant time period, the fact that she went for a period of two years with no care for her back impairment, and the ALJ's finding that the treatment history reported to Dr. Wassaf was not accurate.  *Id.*

I note initially that the ALJ's assessment of Dr. Wassaf's opinion does not appear to contain any consideration of the relevant factors outlined in the applicable regulation, which explicitly apply when the ALJ considers any medical opinion from an acceptable medical source. *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion."). Indeed, the ALJ's explanation for rejecting the extent to which Dr. Wassaf indicated there might be marked levels of limitation does not appear to consider whether Dr. Wassaf's examinations support that finding, relying only on perceived inconsistencies in plaintiff's reports concerning her treatment to Dr. Wassaf at the 2014 examination, nor explicitly whether such findings are inconsistent with the other evidence apart from the ALJ's notations regarding conservative care and type or lack of treatment. The question is therefore whether the decision nevertheless shows that the ALJ otherwise did not traverse the substance of the requirements for weighing medical opinions.

In his report from the 2014 examination, Dr. Wassaf recorded that plaintiff appeared to be in discomfort during the examination of her back,

was unable to stand or walk on her heels, particularly on the left side, and required help to remove her socks and put them back on, but did not need help getting on and off the exam table or rising from her chair. AT 784-85. She was observed to have decreased flexion and extension in her lumbar spine with diffuse tenderness both at the lumbar spine and the right sacroiliac joint. AT 785. A straight leg raising test on the left was positive in the sitting position, although she had intact strength in her upper and lower extremities. *Id.* While the ALJ discussed many of these examination findings in his summary of the record evidence, I note that he did not mention the fact that plaintiff appeared to be uncomfortable or that she required help with her socks, and dismissed the noted inability to walk on her heels and toes as that plaintiff "declined to walk on her heels and toes," which does not appear consistent with what Dr. Wassaf actually recorded.[8] AT 1051-52. However, an ALJ is not required to address every piece of evidence in order to show that it was considered, and failure to discuss certain evidence does not establish that the ALJ failed to consider that evidence. *See Sarah C. v. Comm'r of Soc. Sec.*, 19-CV-1431, 2021 WL 1175072, at *7 (N.D.N.Y. Mar. 29, 2021) (Scullin, J.) (citing *Brault*, 683 F.3d at 448). The ALJ did properly acknowledge the range of findings in Dr.

---

[8]      Such report is consistent with Dr. Wassaf's earlier 2011 examination. AT 406.

Wassaf's examination, which are consistent with the ALJ's overall characterization of the objective medical evidence in the record as showing fairly moderate abnormalities with the exclusion of certain periods of exacerbation, such as when she sought additional treatment for muscle spasms in late 2012 and early 2013.  AT 1050-51.

Because the ALJ made clear throughout his decision that he found that the objective medical evidence, the course of treatment, and lengthy periods without treatment do not substantiate any greater limitations than the moderate portion of the moderate-to-marked limitations opined by Dr. Wassaf, and because a searching review of the record, as it has been discussed above related to the other assertions of error, does not contradict the ALJ's assessment, I recommend finding no error in his assessment of this opinion, as it is clear the ALJ complied with the substance, if not the form, of the regulations regarding the assessment of medical opinion evidence.  *See John L. M. v. Comm'r of Soc. Sec.*, 21-CV-0368, 2022 WL 2800902, at *5 (N.D.N.Y. July 18, 2022) (Dancks, M.J.) (finding no error where the ALJ failed to assess the consistency factor when weighing the treating physician's opinion because a searching review of the record showed that the substance of the rules regarding the weighing of opinion evidence had not been traversed, noting that the opinion was

inconsistent with the other opinions, the treatment records, and the non-medical evidence).  Further, although plaintiff advances extensive arguments regarding whether the ALJ properly and fairly assessed various statements concerning her course of treatment, those arguments should be rejected for the reasons that were discussed above.

For the above reasons, I recommend a finding that the ALJ's partial reliance on the opinion of Dr. Wassaf be found to be proper and supported by substantial evidence.

### iii.   Dr. Tranmar

Dr. Tranmar, who served as plaintiff's neurosurgeon for her previous spinal surgeries, recommended in a treatment note dated March 8, 2010, that plaintiff resume all activities of daily living and incorporate a regular exercise program, and stated that he explained to plaintiff that she had no restrictions at that point in time.  AT 422.  The ALJ afforded significant weight to Dr. Tranmar's opinion that plaintiff was released to all activity without restriction, although he found that it was not entitled to controlling weight because of more recent medical evidence showing ongoing restrictions.  AT 1054-55.  The ALJ, however, declined to rely at all on statements made by Dr. Tranmar in May of 2010 referring plaintiff for

further treatment for her back pain, finding these statements do not constitute a medical opinion and there is no indication Dr. Tranmar treated plaintiff after March of 2010.  *Id.*

I agree with plaintiff that the ALJ's reliance on Dr. Tranmar's opinion was improper and ill-explained.  The ALJ purported to afford his statement that plaintiff has no restrictions significant weight, and yet expressly found that plaintiff has restrictions, and specifically acknowledged that more recent evidence after Dr. Tranmar issued this statement, including evidence from Dr. Tranmar himself only two months later, showed that plaintiff did indeed have restrictions in her activity.  Given this context, it is not apparent how the ALJ reconciled purporting to afford this opinion significant weight with not relying on it at all in practice when formulating the RFC.  Because it is not clear how Dr. Tranmar's opinion actually supports the ALJ's findings, this opinion cannot be said to constitute substantial evidence to support the RFC finding.  However, this error is harmless, given that there exists substantial evidence to otherwise support the ALJ's findings as was already discussed above.

iv.    <u>NP Schneider</u>

Treating NP Lynn Schneider provided multiple opinions, dated November 7, 2011, March 9, 2013, and March 20, 2017, in which she opined generally that plaintiff could sit for only five minutes at one time, stand for ten minutes at one time, lift a maximum of ten pounds, and perform only light housework or childcare, as well as that she was unable to work outside of the home at those times.  AT 424, 770.  The 2017 opinion contained additional, but no less restrictive, limitations.  AT 873-78. As to the various opinions submitted by NP Schneider, the ALJ found they are generally entitled to little weight, as he found them to be inconsistent with her own treatment history of plaintiff, the objective clinical evidence since the alleged onset date, and the other pertinent medical evidence.  AT 1052-53.  Specifically, the ALJ noted that (1) her opinions appear to be generally based on plaintiff's subjective allegations, (2) plaintiff was not receiving prescribed treatment for her allegedly disabling back pain in September 2011 and objective signs, particularly of weakness in her left leg, at that time were not consistent with the results of other examinations since the alleged onset date, (3) plaintiff's treatment history does not support such limitations, including the fact that she was not prescribed any consistent pain medications after January 2011, and that she did not receive any treatment after February 2013 through the rest of the relevant

period, and (4) evidence from after the DLI also shows very few positive findings.  AT 1053.

I recommend a finding that the ALJ's choice to afford these opinions little weight is supported by substantial evidence.  As the ALJ acknowledged, NP Schneider is not an acceptable medical source under the applicable regulations, and therefore the ALJ was not subject to the same stringent rules regarding articulation of the reasons for the weight afforded to her opinion as he was related to the other opinions, nor were her opinions entitled to any special deference.  20 C.F.R. § 404.1527(f).  Further, for all of the reasons already discussed, the explanations that the ALJ gave for affording her opinions little weight are supported by substantial evidence and sufficient to support his finding.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

After considering the record as a whole and the issues raised by the plaintiff in support of her challenge to the Commissioner's determination, I recommend a finding that the determination resulted from the application of proper legal principles and is supported by substantial evidence.  Accordingly, it is hereby respectfully

RECOMMENDED that the Commissioner's decision be AFFIRMED, defendant's motion for judgment on the pleadings (Dkt. No. 16) be

GRANTED, plaintiff's motion for judgment on the pleadings (Dkt. No. 12) be

DENIED, and plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days

within which to file written objections to the foregoing report. Such

objections shall be filed with the Clerk of the Court. <u>FAILURE TO OBJECT</u>

<u>TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE</u>

<u>APPELLATE REVIEW</u>. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir.

1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


Dated:      June 8, 2023                    _____
            Syracuse, NY                    DAVID E. PEEBLES
                                            U.S. Magistrate Judge